UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANNE DAVIS, on behalf of Braeden Davis, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Case No. 21-02884 (RJL) ) |
| DISTRICT OF COLUMBIA, | ) ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION**
(November 19, 2021) [Dkts. #6, #7]

Plaintiff Anne Davis ("plaintiff") brings this action on behalf of her son, Braeden Davis, against the District of Columbia (the "District") under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Compl. [Dkt. #1]. Plaintiff alleges the District deprived her son of a free appropriate public education ("FAPE") in violation of the IDEA by failing to maintain Braeden in a residential treatment facility ("RTC") after the RTC where he was living and receiving services discharged him on October 31, 2021. *Id.* ¶¶ 32–54, Prayer for Relief. Presently before the Court are plaintiff's Motion for Temporary Restraining Order [Dkt. #6] and Motion for Preliminary Injunction [Dkt. #7] (collectively "Pl.'s Mots.").[1] In these motions, plaintiff seeks emergency injunctive relief in the form of an Order under the "stay-put" provision of the IDEA, 20 U.S.C. § 1415(j), requiring the District to provide Braeden housing and

---

[1] Plaintiff's motions are identical. Accordingly, I address them simultaneously here.

1

personnel approximating the services he would receive at an RTC until a new appropriate residential facility is found that will accept Braeden. *See* Pl.'s Mots. at 12. Upon consideration of the parties' pleadings, relevant law, the entire record herein, and for the reasons stated below, I disagree with plaintiff's argument that the stay-put provision of the IDEA entitles her to such relief. Accordingly, I DENY plaintiff's motions.

## BACKGROUND

Braeden is 21 years old and classified as "multiply disabled." Compl. ¶ 9. His conditions include autism spectrum disorder, attention deficit hyperactivity disorder, unilateral fluctuating hearing loss, and other learning disabilities. *Id.* As a result of his disability, District of Columbia Public Schools ("DCPS") and the Office of the State Superintendent of Education ("OSSE"), the agencies through which the District complies with its educational obligations, recognize Braeden as eligible for special education and associated services under the IDEA.[2] *Id.* ¶ 6. The specific educational services Braeden receives are determined by his individualized education plan ("IEP")—a comprehensive and individualized document that is routinely updated to ensure Braeden is on track to achieve his educational goals. *See* Ex. F to Pl.'s Mots.

Braeden's last IEP was issued on March 29, 2021 ("March 29 IEP"). It concludes that, given the severity of Braeden's learning deficits, he is "unable to attend school with general education peers" and needs "a highly structured educational and residential environment, with 1:1 supervision and a highly structured behavioral intervention

---

[2] As a result of related litigation not at issue here, Braeden will remain eligible under the IDEA until at least 2024. Compl. ¶ 21.

2

program."[3] *Id.* at 27.  The March 29 IEP also provides for the following services:

- 1:1 dedicated aide for 8 hours per day
- Specialized instruction for 22.5 hours per week
- Speech/Language therapy for 6 hours per month
- Occupational therapy for 12 hours per month, and
- Behavioral support services for 12 hours per month

*Id.* at 25–26.

Consistent with his IEP, Braeden had been living and receiving educational services at a private RTC—the Community Services for Autistic Adults and Children ("CSAAC")—since August 2020.  On October 1, 2021, however, CSAAC informed the District and plaintiff that it was "no longer the appropriate placement for Braeden, and [was] unable to meet his needs."  Ex. G to Pl.'s Mots.; Compl. ¶ 33.  CSAAC reached this decision unilaterally without any input from the District, DCPS, OSSE, or members of Braeden's IEP team.  *See* Declaration of Katie Reda ("Reda Decl.") [Dkt. #14-1] ¶ 9.  CSAAC stated it intended to discharge Braeden as of October 31, 2021, giving the parties a month to find a new RTC or otherwise determine how to proceed.  Ex. G to Pl.'s Mots.; Compl. ¶ 33.

On October 6, representatives from DCPS, OSSE, and CSAAC met with plaintiff and plaintiff's counsel.  *See* Compl. ¶ 49; Reda Decl. ¶ 9; Declaration of Nicholas Weiler ("Weiler Decl.") [Dkt. #14-2] ¶ 7.  The parties discussed which RTCs could be viable candidates to replace CSAAC.  Compl. ¶ 50; Reda Decl. ¶¶ 11–12.  Because all OSSE-

---

[3] Defendant refers to this IEP as the "February 12, 2021 IEP" because, defendant contends, the underlying IEP meeting was held on February 12, 2021. *See* Def.'s Opp'n at 3.  This is an immaterial semantic difference.  Defendant does not contest the contents of the IEP or the fact that it was Braeden's most recent IEP prior to the initiation of this lawsuit. *See* Def.'s Opp'n at 3 n.4.

approved facilities had already rejected Braeden in the past—some on multiple occasions—the participants agreed to move forward by making referrals to residential programs outside of OSSE's approved list. Reda Decl. ¶ 12. Beginning the next day, OSSE began sending referrals to RTCs seeking a replacement facility. *Id.* ¶ 13. To date, OSSE has referred Braeden to 19 RTCs, all but one of which has rejected his application.[4] *Id.* ¶¶ 13–33.

Anticipating that a new RTC might not accept Braeden before he was discharged from CSAAC, plaintiff asked DCPS at the October 6 meeting to develop a plan to provide Braeden with interim services to avoid any gap in his education. Compl. ¶ 50. To that end, DCPS provided an "Interim Services Authorization" on October 21, 2021. Ex. C to Pl.'s Mots. This offer for interim services was then updated on November 9, 2021.[5] Ex. 4 to Def.'s Opp'n [Dkt. #14-4]. Under the current updated version, the District authorizes the following services subject to certain per-hour and total-cost maximums:

- 1:1 dedicated aide for 8 hours per day
- Specialized instruction for 22.5 hours per week
- Speech/language therapy for 10 hours per month
- Occupational therapy for 12 hours per month
- Behavioral support services for 16 hours per month
- Counseling for 4 hours per month

*Id.*

Collectively, the Interim Services Authorization provides for up to $17,268.86 per month in services for Braeden and states that "these services may be re-authorized on a

---

[4] As of the time of this Opinion, one RTC is still reviewing Braeden's application and he remains in consideration for that program.
[5] The only material difference between the October 21 and November 9 authorizations is that the District added a 1:1 dedicated aide for 8 hours per day in the November 9 update.

month-to-month basis until the student is accepted to an educational program that meet [sic] the student's needs as outlined in his IEP."[6] *Id.*

Despite multiple requests from the District to postpone Braeden's discharge date, CSAAC discharged Braeden on November 1, 2021. *See* Aff. of Ms. Anne Davis ("Pl.'s First Aff.") [Dkt. #11-1] ¶ 3. Since that time, he has not returned home. Second Aff. of Ms. Anne Davis ("Pl.'s Second Aff.") [Dkt. #17-3] ¶ 1. Instead, plaintiff and a series of private aides have attended Braeden at a private hotel, providing round-the-clock care. *Id.* ¶¶ 8–10. Plaintiff estimates the cost of these housing and behavioral support accommodations amounts to $7,740.39 per week. Pl.'s First Aff. ¶¶ 3, 8.

The District has refused to cover these expenses, asserting that, according to its residential placement guidelines, it does not provide interim housing when a student is discharged from a residential placement. *See* Ex. 3 to Def.'s Opp'n [Dkt. #14-3] at 9. At oral argument, the District represented that, in the ordinary course, students in this situation return home until a new residential facility is located. Status Conf. Regarding Prelim. Inj. and Temp. Restraining Order, Rough Hearing Tr. at 24:9-13 (Nov. 8, 2021).

Unsatisfied with the District's response, plaintiff brought a due process complaint on October 28, 2021 alleging the District violated the IDEA by failing to provide an RTC or "truly comparable services" upon Braeden's discharge from CSAAC. Ex. 5 to Def.'s Opp'n [Dkt. #14-5] at 9. Plaintiff concurrently sought relief under the stay-put provision

---

[6] As an alternative to the Interim Services Authorization, the District has also offered Braeden attendance in a virtual learning program, including a virtual aide, through the Woodrow Wilson High School. Weiler Decl. ¶ 13.

of the IDEA. Ex. 6 to Def.'s Opp'n [Dkt. #14-6] at 1.

While the due process proceeding was pending, on November 2, 2021, plaintiff sought relief in this Court by filing the instant complaint and, concurrently, seeking relief under the stay-put provision through the instant motions. *See generally* Compl.; Pl.'s Mots. On November 8, I heard initial argument on these motions. Two days later, the administrative hearing officer denied plaintiff's motion for relief under the stay-put provision. Ex. 6 to Def.'s Opp'n at 1. On November 16, I heard additional argument on plaintiff's motions, and I now resolve them herein.

## ANALYSIS

Plaintiff moves for preliminary injunctive relief under the stay-put provision of the IDEA, which, as relevant here, states that

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . .

20 U.S.C. § 1415(j).

As the Supreme Court has explained, Congress intended the stay-put provision to "strip schools of the unilateral authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school." *Honig v. Doe*, 484 U.S. 305, 323 (1988). The effect of the provision is a statutory stay that maintains the status quo when parents and schools litigate changes to a child's special education program. *See Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 527 (D.C. Cir. 2019). Because this is a statutory stay, the traditional four-factor test for preliminary injunctions

6

does not apply. *Id.* Instead, the stay-put provision "effectively provides for an automatic statutory injunction upon a two-factor showing that (i) an administrative due process proceeding is pending and (ii) the local educational agency is attempting to alter the student's then-current educational placement." *Id.*

Defendant does not dispute that the first factor is satisfied here as plaintiff has brought an underlying due process complaint regarding the same allegations presented in her complaint. *See* Ex. 5 to Def.'s Opp'n. The parties disagree ardently, however, over the second factor—whether a change has occurred with respect to Braeden's educational placement that is sufficient to trigger the statutory stay. Pl.'s Mots. at 10–12; Def.'s Opp'n at 5–9. Courts typically address this factor through a two-step inquiry. First, they determine what comprised the child's "then-current educational placement." *G.B. v. District of Columbia*, 78 F. Supp. 3d 109, 112 (D.D.C. 2015). Second, they decide whether the local educational agency fundamentally changed that placement. *Id.*; *see also Lunceford v. District of Columbia Bd. of Educ.*, 745 F.2d 1577, 1581 (D.C. Cir. 1984) (holding plaintiffs "must identify, at a minimum, a *fundamental change* in, or elimination of a basic element of the education program in order for the change to qualify as a change in educational placement").

Although the IDEA does not define the term, the parties do not dispute that Braeden's March 29 IEP serves as the "dispositive factor" in determining his "then-current educational placement." Pl.'s Mots. at 10; Def.'s Opp'n at 5; *see also Johnson v. District of Columbia*, 839 F. Supp. 2d 173, 177 (D.D.C. 2012) ("Typically, the dispositive factor in deciding a child's current educational placement should be the IEP . . . actually

7

functioning when the stay put is invoked."); *G.B.*, 78 F. Supp. 3d at 112; *see also Spilsbury v. District of Columbia*, 307 F. Supp. 2d 22, 25–26 (D.D.C. 2004) (holding last mutually agreeable IEP established student's "current educational placement"). Consistent with the March 29 IEP, I find that Braeden's then-current educational placement at the time this litigation ensued included a residential treatment facility with 1-on-1 support services and significant behavioral intervention. *See* Ex. F to Pl.'s Mots.; Ex. 6 to Def.'s Opp'n at 4 (hearing officer finding same). It also included the specific services listed in the March 29 IEP, including the services of a single 1-on-1 aide for 8 hours per day.[7] *See* Ex. F. to Pl.'s Mot.

Turning to the second issue, I must determine whether the changes that have occurred to Braeden's placement are fundamental changes, i.e. of the type and degree sufficient to trigger the statutory protection of the stay-put provision. *Lunceford*, 745 F.2d at 1581. The District argues that because plaintiff "takes exception to CSAAC's unilateral decision to end Braeden's enrollment" and not "a decision of the school system or the IEP team to change Braeden's educational placement," she has not shown a fundamental change. Def.'s Opp'n at 6. The unwritten premise of the District's argument is that unilateral changes outside of a local educational agency's control simply do not trigger the

---

[7] Plaintiff notes that an October 2020 IEP Amendment provided Braeden with an extra aide so that he received 2-on-1 care. *See* Pl.'s Mots. at 4. Nonetheless, plaintiff concedes that the March 29 IEP, which was issued six months *after* the October 2020 Amendment, only provides for a single aide for 8 hours per day. *See id.* (asserting the March 29 IEP provided "1:1 aide for 8 hours per day"). Because it is the last functioning IEP that serves as the decisive factor in this inquiry, I conclude that Braeden's then-current educational placement only required one aide for 8 hours per day. *See Johnson*, 839 F. Supp. 2d at 177; *Spilsbury*, 307 F. Supp. 2d at 25–26. To the extent Braeden nonetheless received additional behavioral support while attending CSAAC, *see* Ex. C to Pl.'s Reply [Dkt. #17-2], I find the District need not emulate these services on an interim basis for the same reasons the District need not emulate CSAAC's housing services. *See infra* at 11–15.

statute's stay-put provision. *See id*. The District does not dispute that it maintains an obligation to identify a new RTC and to provide educational services outlined in the March 29 IEP,[8] but it contends that it lacks any duty to re-create CSAAC's housing and associated services, as these were unilaterally made unavailable through circumstances outside of the District's control and contrary to its repeated requests for reconsideration. *See id*. at 6–9.

Plaintiff disagrees, arguing that Braeden's discharge from CSAAC and the District's failure to subsequently provide comparable services constitutes a fundamental change warranting stay-put relief. Pl.'s Mots. at 3, 10–12. Relying primarily on our Circuit's decision in *Knight by Knight v. District of Columbia*, plaintiff contends that where a student's placement becomes unavailable, the District must provide an alternative placement on an interim basis regardless of the circumstances. *See* Pl.'s Reply at 4 (citing 877 F.2d 1025, 1028 (D.C. Cir. 1989). Where, as here, no RTC accepts the student, plaintiff contends the stay-put provision requires the District to emulate an RTC by "fund[ing] a comparable least restrictive environment with appropriate housing and personnel."[9] Pl.'s Reply at 10. Unfortunately for plaintiff, I agree with the District that the stay-put provision does not require such relief. How so?

At the outset, I disagree with plaintiff's suggestion that our Circuit precedent controls.[10] The Court of Appeals has rarely opined on the stay-put provision, and,

---

[8] The District's concession is well taken. "In order to provide a FAPE, after an IEP is designed, the District must . . . implement the IEP . . . in a school that can fulfill the requirements set forth in the IEP." *Johnson v. District of Columbia*, 962 F. Supp. 2d 263, 268 (D.D.C. 2013).

[9] Both parties appear to accept that the Court is unable to order CSAAC to continue to house or provide services to Braeden. *See Lunceford*, 745 F.2d at 1580–81.

[10] In addition to our Circuit Court's precedent, plaintiff places significant reliance on *Schiff v. District of Columbia*, Civ. No. 18-1392, 2019 WL 5683903 (D.D.C. Nov. 1, 2019). The analogy fails. Not only

critically, it has never addressed the precise issue here—whether that provision imposes affirmative duties to create or approximate a residential facility on an interim basis where none is available due to circumstances entirely outside of the District's control.

It is true that our Circuit Court did indeed comment on the District's obligations under the stay-put provision in a manner favorable to plaintiff's case. *See Knight by Knight v. District of Columbia*, 877 F.2d 1025, 1029 (D.C. Cir. 1989) (noting that the District had an "obligation to provide a 'similar' placement, on an interim basis, when a child's prior placement is no longer available and a new and 'appropriate' placement has not yet been finally determined"); *McKenzie v. Smith*, 771 F.2d 1527, 1533 & n.3 (D.C. Cir. 1985) (noting that where student's school was unavailable, "DCPS was obligated to locate and arrange a placement in a similar program"); *Lunceford*, 745 F.2d at 1580–81 (noting that, where a fundamental change occurs, "it appears that the District, in order to satisfy its statutory obligation, must provide [the student] other facilities—ones more closely resembling [the prior placement]—which would maintain his educational placement at least until hearings are completed"). In these cases, however, the District had successfully placed[11] the student in an interim school and the litigation focused on the adequacy of the

---

does *Schiff* not interpret the stay-put provision at issue here, but its legal conclusions are limited to holding that the contractual defense of impossibility does not apply in the IDEA context. *Id.* at *7. Defendant here is not making any such argument, which limits *Schiff*'s relevance to the present dispute. Moreover, *Schiff* is factually distinct as well. In that case, the District argued that it had no responsibility to implement the student's IEP—a position that "resulted in a total failure to provide any services prescribed by [the student's] IEP." *Id.* at *6. Here, by contrast, the District is not attempting to entirely forego its obligations to educate Braeden. It has indisputably engaged in a thorough and ongoing search for an appropriate placement and continues to provide the educational services outlined in Braeden's IEP in the interim.

[11] In *Smith*, the student never attended the proposed placement because his parents unilaterally placed him in a separate private facility. *See Smith*, 771 F.2d at 1530–31. Nonetheless, the stark factual contrast to the present case is evident. Far from a lack of interim options, there were numerous available facilities in

new location as compared to the prior placement. *Knight*, 877 F.2d at 1029 (finding no violation of the stay-put provision in light of student's transfer from a private to public school); *Smith*, 771 F.2d at 1533 (finding public school inappropriate where student required a residential environment); *Lunceford*, 745 F.2d at 1582–83 (holding stay-put provision inapplicable because no fundamental change occurred in transferring student from one residential facility to another). Our Circuit was not confronted with, nor did it opine on, the District's obligations under the stay-put provision *where no similar interim school was available* despite good faith efforts to "locate and arrange a placement" in such a facility. *Smith*, 771 F.2d at 1533. To hold that in such circumstances the District must create out of whole cloth a residential facility—or approximate one by compensating for housing and personnel expenses—would constitute a significant extension of *Knight* and its predecessors. As such, I conclude the *Knight* line of cases fails to dictate the outcome here and is best read for the proposition that, *where available*, the stay-put provision requires the District to place a student in an interim placement that is similar to its prior placement.[12]

Having determined the outcome here is not governed by Circuit precedent, I must assess in the first instance whether the statute is susceptible to plaintiff's novel interpretation. Turning first to the text, I find there is nothing to support plaintiff's position.

---

*Smith* and the litigation focused on the relative appropriateness of these as compared to the student's prior placement, not on the unique question presented here—what to do where no facilities are available. *See id.* at 1531–32.

[12] This more limited reading is consistent with our Circuit Court's more recent descriptions of the District's stay-put obligations. *See Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 527 (D.C. Cir. 2019) (describing stay-put relief as only available where "*the local educational agency* is attempting to alter the student's then-current educational placement").

The statute commands that a child "shall remain" in his or her current placement. 20 U.S.C. § 1415(j). Such prohibitory language falls well short of prescribing the significant affirmative obligations that plaintiff seeks to read into it. *Wagner v. Board of Educ. of Montgomery Cty.*, 335 F.3d 297, 301 (4th Cir. 2003) ("By its terms, section 1415(j) does not impose any affirmative obligations on a school board; rather, it is totally prohibitory in nature."). In short, the provision's text demonstrates that it operates as a shield against school board action and not a sword intended to effectuate affirmative remedies. *See Honig*, 484 U.S. at 323 (holding that in enacting the stay-put provision, Congress intended to combat the specific ill of unilateral exclusion of disabled students by school boards); *Wagner*, 335 F.3d at 300 ("In a typical section 1415(j) case, the school board is attempting to remove the child, whether through expulsion or by other means, from his or her current placement and the parents are seeking to stop that action."); *Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 534 (2d Cir. 2020). This is especially true where the unavailability of a student's placement occurs as a result of circumstances outside the school board's control. *See Tilton by Richards v. Jefferson Cty. Bd.*, 705 F.2d 800, 805 (6th Cir. 1983) (stay-put provision does not apply where a state or local agency "must discontinue a program or close a facility for purely budgetary reasons"); *Weil v. Bd. of Elementary & Secondary Educ.*, 931 F.2d 1069, 1073 (5th Cir. 1991) ("[I]f the change in 'educational placement' is necessitated by the closure of a facility for reasons beyond the control of the public agency, the stay-put provisions . . . do[es] not apply.").

The structure of Section 1415, read as a whole, not surprisingly confirms this interpretation. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In

ascertaining the plain meaning of the statute, the Court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."). In a nearby subsection, Congress provided hearing officers the ability to place a child in an "appropriate interim alternative educational setting" under certain circumstances, including when the public agency shows that "the current placement of such child is substantially likely to result in injury to the child or others." 20 U.S.C. § 1415(k)(2). The explicit authorization of a change in placement on an interim basis here shows the drafters knew how to provide for such relief, where appropriate, and could have authorized such relief where a student's placement became unavailable. *See Wagner*, 335 F.3d at 302. Instead, they chose not to. Section 1415(j)'s silence on this front speaks volumes to the court's power, or lack thereof, to authorize similar interim alternative placements under the stay-put provision.

Congress did not, however, leave parents without an avenue to achieve uniquely tailored interim relief similar to what plaintiff seeks here. Section 1415(i)(2)(B)(iii) broadly empowers courts to "grant such relief as the court determines is appropriate," and plaintiffs are free to utilize this broad grant of authority to obtain, where appropriate, emergency alterations to a student's educational placement. *See Wagner*, 335 F.3d at 302. Unlike the stay-put provision, however, which operates as an automatic stay upon a comparably simple showing, immediate relief under section 1415(i)(2)(B)(iii) requires plaintiffs to satisfy the more onerous traditional preliminary injunction factors. *See Wagner*, 335 F.3d at 302. Viewed collectively with section 1415(j) and the larger goals of the IDEA, it is entirely logical that Congress would create a heavy presumption in favor of

maintaining children in their current educational placements, yet also provide a "safety-valve" to ensure interim placements may be constructed where irreparable harm would imminently occur without immediate court intervention. *See Wagner*, 335 F.3d at 302–03; ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 24 (2012) (judicial interpretation requires consideration of "the entire text, in view of its structure and of the physical and logical relation of its many parts"). To the extent plaintiff seeks a significant alteration of Braeden's placement in light of changed circumstances and to avoid imminent harm, her request for relief would have been best framed under section 1415(i)(2)(B)(iii).

Based on this reading of the statute, I find plaintiff is not entitled to the relief she seeks. Plaintiff's contention for a stay-put injunction rests entirely on the unavailability of the housing and personnel services CSAAC provided. For the reasons described above, the stay-put injunction cannot be used to require the District to re-create these aspects of a residential facility where, as here, they became unavailable through circumstances totally outside of the District's control, to date the District has engaged in a thorough and ongoing search for an appropriate replacement facility, and the District has made available to Braeden the full complement of other services outlined in his IEP on an interim basis.[13] Accordingly, I deny plaintiff's motions.

## CONCLUSION

For the foregoing reasons, the Court DENIES plaintiff's Motion for Temporary

---

[13] I need not address whether preliminary injunctive relief would be appropriate under the stay-put provision, 20 U.S.C. § Section 1415(i)(2)(B)(iii), or an alternative theory were the District to cease in the provision of these interim services. That question is not presented here.

Restraining Order [Dkt. #6] and Motion for Preliminary Injunction [Dkt. #7]. An Order consistent with this decision accompanies this Memorandum Opinion.

*[signature]*
RICHARD J. LEON
United States District Judge